

# IN THE
# TENTH COURT OF APPEALS

### No. 10-10-00049-CR

**MATT D. BAKER,**

                                                    **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                    **Appellee**

---

**From the 19th District Court**
**McLennan County, Texas**
**Trial Court No. 2009-0456-C1**

---

## MEMORANDUM  OPINION

---

Matt Baker was convicted of the offense of murder and sentenced to sixty-five years in prison.  TEX. PEN. CODE ANN. § 19.02 (West 2008).  Baker complains that he received ineffective assistance of counsel, that the evidence was insufficient to establish the *corpus delicti*, that the evidence of guilt was legally and factually insufficient, and that the trial court's conduct throughout the trial rendered his trial unfair.  Because we find no reversible error, we affirm the judgment of the trial court.

*Ineffective Assistance of Counsel*

Baker complains that he received ineffective assistance of counsel because his trial counsel did not object to the presence of an alternate juror in the jury room during deliberations, which was statutorily prohibited. *See* TEX. CODE CRIM. PROC. ANN. art. 36.22 (West 2009). At the conclusion of the guilt-innocence phase of the trial, the trial court ordered the alternate juror to go into the jury room for deliberations but instructed that juror not to participate in the deliberations in any manner. Baker's trial counsel stated that they had no objection to this. Baker filed a motion for new trial alleging ineffective assistance of counsel for the failure to object to the inclusion of the alternate juror in deliberations and a hearing was conducted, during which Baker's trial attorneys and two jurors testified.[1]

To prevail on an ineffective-assistance claim, Baker must prove (1) counsels' representation fell below the objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsels' deficiency, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Ex parte Ellis*, 233 S.W.3d 324, 330-31 (Tex. Crim. App. 2007).

---

[1] The motion for new trial also complained of a violation of Article V, Section 13 of the Texas Constitution; however, after the date of the motion for new trial hearing, the Court of Criminal Appeals issued its opinion in *Trinidad v. State*, in which the Court held that the inclusion of alternate jurors does not violate the Texas Constitution absent evidence of that alternate juror's participation in the voting during deliberations. *See Trinidad v. State*, 312 S.W.3d 23, 28 (Tex. Crim. App. 2010). The Court specifically did not address whether there was a statutory violation because that issue was not properly preserved at the trial court. *Id*. at 29.

It is not necessary for us to address whether or not there was a violation of article 36.22 because Baker has not met the requirements of the second prong of *Strickland*; that is, he has not proven that the outcome would have been different or that the verdict was affected in any way by the presence of the alternate juror. The trial court gave strict instructions to the entire panel, including the alternate juror that the alternate juror was not to participate in any way during deliberations. The foreperson and one other juror testified that the alternate juror did not participate in the deliberations and did not make any facial gestures or other reaction. The foreperson testified that the alternate started to speak in the guilt-innocence deliberations, but that she told the alternate not to participate. There is no evidence that the jury did not follow the trial court's instructions. Because Baker has not satisfied the second prong of *Strickland*, we find that he did not receive ineffective assistance of counsel for his trial counsels' failure to object to the presence of the alternate juror during jury deliberations. We overrule issue one.

### *Legal Sufficiency*

Baker complains that the State did not establish the *corpus delicti*, that is, that other than his out-of-court confession, there was insufficient evidence that the death of his wife was caused by a criminal act perpetrated by him, and that the evidence was legally insufficient.

### *Corpus Delicti*

In a murder case, the *corpus delicti* is (a) the death of a human being that is (b) caused by the criminal act of another. *Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim.

App. 1993); *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997). Under the *corpus delicti* rule, a defendant's own extrajudicial confession is insufficient to sustain his conviction for an offense unless it is corroborated by independent evidence tending to establish the fact that the offense in question has been committed by someone. *Salazar v. State*, 86 S.W.3d 640, 644 (Tex. Crim. App. 2002). The independent, corroborating evidence need only make the fact of the crime more probable than it would otherwise be. *See Rocha v. State*, 16 S.W.3d 1, 4-5 (Tex. Crim. App. 2000). It is not required that the independent, corroborating evidence meet the legal sufficiency test announced in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). *See id*. Once the fact that the offense was committed by someone is corroborated by independent evidence, a defendant's own extrajudicial confession, even standing alone, is sufficient to tie him to that crime. *See Salazar*, 86 S.W.3d at 644 ("the *corpus delicti* rule . . . does not also require any independent evidence that the defendant was the criminal culprit") (emphasis omitted).

*Legal Sufficiency*

In reviewing the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.). We defer to the jury's determinations of the witnesses' credibility and the weight to be given their testimony because the jury is the sole judge of those matters. *Brooks*,

323 S.W.3d at 899. Because we are conducting a legal sufficiency review, our discussion of the facts below is in a light most favorable to the prosecution.

*Facts*

On Friday, April 7, 2006, law enforcement was summoned to the residence of Baker and his wife, Kari. Baker had called 9-1-1 claiming that he had returned home to find Kari lying in a fetal position on their bed in a state of undress. Baker claimed that he had moved Kari to the floor, partially dressed her, and attempted to resuscitate her during the approximately four minutes until assistance arrived, all while on the phone with the 9-1-1 dispatcher. Medical personnel were unable to revive Kari. At the scene, an open bottle of Unisom was found on the nightstand with one pill inside the bottle and two on the nightstand next to the bottle. Additionally, two empty wine cooler bottles, two ink pens, and a typed, unsigned suicide note purportedly written by Kari were found on the nightstand next to the bed. A justice of the peace declared Kari dead and ruled the cause to be suicide over the phone without visiting the scene. No autopsy was ordered.

After Kari's parents became suspicious of the circumstances surrounding her death, the justice of the peace that had ruled her death a suicide conducted a formal inquisition as to her death. Kari's body was exhumed and an autopsy was performed. The autopsy did not establish a cause of death because of the passage of time and the embalming of the body, both of which made it difficult to conclusively determine what substances were in Kari's body at the time of her death or the cause of her death.

However, the cause of death was changed from "suicide" to "undetermined" following the inquest.

Kari's parents filed a wrongful death lawsuit against Baker, and during those proceedings and throughout the investigation of the criminal case against him, Baker gave a deposition and made several statements as to what he contended had occurred. He did not testify at the trial.

Baker contended that he had left the residence at approximately 11:00 p.m. to get gasoline and to rent a movie that Kari had requested him to go rent at that time. Baker arrived home approximately 45 minutes later to find the master bedroom door locked. Baker had to pry the door open, where he discovered Kari's body on their bed. The Bakers' two children were asleep in their bedrooms when he left and there is no indication that they were ever awake while emergency and law enforcement personnel were present after Kari's death. Baker claimed that Kari had been severely depressed since the death of their daughter approximately seven years prior. Law enforcement discovered an opened bottle of Unisom with only a few pills remaining,

Kari was buried on Monday following her death. At the visitation prior to the funeral, Kari's counselor approached Baker and she stated that Baker asked her if Kari had said anything about him trying to kill her (Kari). Baker did not appear to be behaving in a manner consistent with a grieving person.

Approximately two weeks later, Baker's daughter had a birthday party where Baker's paramour, Vanessa Bulls, was present. The photos of Kari in the house had been removed and at least partially replaced with photos of Bulls and her child. Bulls

spent the night at the house that night, although Bulls had given inconsistent statements as to which bedroom in the house she had stayed and what transpired during the night. Additionally, Baker and Bulls were seen together shopping for engagement rings with the Bakers' children shortly after Kari's death.

Baker and Bulls began having an extra-marital affair in March of 2006, which was the month prior to Kari's death. Baker, who was then a pastor, was counseling Bulls regarding her failed marriage when the affair began. It did not appear that Kari was aware of the relationship between Baker and Bulls, however, she and Baker were having marital problems and Kari was concerned that perhaps Baker was having an affair. Earlier the day of Kari's death, she had interviewed for a transfer to teach junior high at a new school and was excited about her future prospects. In the early evening of her death, Baker and Kari were at a swim lesson of one of their daughters, and Kari was visibly upset, although why she was upset was unknown.

Kari had been diagnosed shortly before her death with anxiety and depression, although she denied being depressed and repeatedly denied any suicidal ideations. She had made an appointment to see the counselor that had treated her after her daughter's death in 1999 from cancer at the age of one. At that appointment, Kari indicated that she was fearful that Baker might intend to harm her, but later stated that she did not believe that he would harm her. Kari had discovered crushed pills in Baker's briefcase one time although Baker claimed that they had been placed there by a child at the Waco Center for Youth because they do not like to take their medication sometimes.

During the relevant times leading up to and subsequent to Kari's death, Baker was also employed at the Waco Center for Youth. It was discovered on the Center's server that Baker had visited several websites relating to the purchase of Ambien (as opposed to research about Ambien) and had also done internet searches on overdosing on sleeping pills. However, there was no evidence that Baker had actually purchased Ambien.

In the week following Kari's death, Baker gave Kari's cell phone to Bulls to use. This phone was paid for by Kari's parents, who became suspicious when they determined that Kari's phone was being used shortly after her death, with many calls between Baker and Bulls.

In mid-June of 2006, Baker reported that a computer had been taken from the office next to his at the Waco Center for Youth. Further investigation established that the computer that had formerly been in that office had been removed and placed in Baker's office and that Baker's computer was actually the one missing. A label that had been placed on Baker's original computer had been removed and placed on the one taken from the adjacent office, which was then located in Baker's office. Baker's computer was never recovered. Additionally, Baker had disposed of his home computer at some time after Kari's death.

Bulls agreed to testify in exchange for testimonial immunity. She had given several statements prior to the trial, including testifying before the grand jury. None of Bulls' statements were entirely consistent with each other or with her trial testimony. She admitted that she had been untruthful or not fully truthful in her earlier statements.

Bulls claimed that before Kari's death, Baker had told Bulls that he wanted to kill Kari and to make it look like a suicide. He told Bulls that he had attempted to kill her approximately two weeks prior to her actual death by crushing pills and mixing them in a milkshake, but that Kari didn't like the taste of it and didn't drink it. Baker told Bulls that on the night of Kari's death he had taken several sexual stimulant capsules, emptied them, and refilled them with crushed Ambien, which Kari then took. After she fell asleep, Baker told Bulls that he had placed a pillow over her face and smothered her. He had typed and printed out a suicide note, which he ran Kari's fingers over prior to placing it next to the bed. Baker told Bulls that because she knew what was going to happen before he did it and then knew how he did it, Bulls was as guilty as Baker was for her death, but that God would forgive them. Bulls ultimately broke up with Baker later in 2006, but stated that she did not admit to the affair or to knowing about how Baker had killed Kari because she was afraid of what Baker might do to her and because she feared being held responsible for Kari's death. Bulls stated that she knew that her testimony would likely result in her losing her job as a teacher so she had no reason to make up her testimony.

The only physical evidence that indicated that a crime had occurred was an abrasion on Kari's nose that a forensic pathologist observed on photographs taken of Kari during the autopsy, but that abrasion was only observed by that one individual. It was impossible to determine if Kari's DNA was on anything because a sample could not be retrieved from her body after it was exhumed. Additionally, because law

enforcement initially believed it was a suicide, the suicide note and the Unisom bottle were handled without gloves by multiple persons.

*Analysis*

Viewing the evidence in a light most favorable to the prosecution, we find that the evidence independent of Baker's extrajudicial confession to Bulls makes the commission of Kari's murder more probable than it would have been without the independent evidence, which satisfies the *corpus delicti* corroboration requirement. Additionally, we find that the totality of the evidence, including Bulls's testimony regarding Baker's confession to her, is sufficient for a reasonable juror to have found Baker guilty of murder beyond a reasonable doubt, and therefore, the evidence is legally sufficient. We overrule issue two.

*Factual Sufficiency*

Baker complains that the evidence was factually insufficient to sustain his conviction. Baker further contends that since *Clewis v. State* was overruled by only a plurality of the Court of Criminal Appeals in *Brooks v. State*, it has no precedential effect and therefore a factual sufficiency analysis is required. *See Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) (plurality op.). While Baker is correct that the decision in *Brooks* was a plurality opinion, the Court of Criminal Appeals has since affirmed the elimination of factual sufficiency review with an outright majority. *See Howard v. State*, 333 S.W.3d 137 (Tex. Crim. App. 2011) (unanimous op.) ("we have abolished factual-sufficiency review"); *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010)

(Meyers, J. dissented); *Wirth v. State*, 327 S.W.3d 164, 165 (Tex. Crim. App. 2010) (Meyers, J. dissented).  We overrule issue three regarding factual sufficiency.

*Conduct of the Trial Court*

Baker complains that the trial court made comments and interrupted the proceedings to benefit the State, and that this conduct rendered his trial unfair because the trial court's actions demonstrated a bias in favor of the State.  Specifically, he complains of the following:

| | |
|---|---|
| WITNESS: | I did not notice any.  We checked for lividity and we checked for a pulse and checked for breathing.  I did not notice any. |
| STATE: | Okay.  And – |
| THE COURT: | Mr. Long, you might get him to explain what lividity is. |
| STATE: | What is lividity? |
| WITNESS: | Lividity is pooling of the blood in the body to the lowest point.  If I was sitting in a chair right now, for an example, if I was to die, my blood would pool in my lower back and in my feet area is what it would do. |

---

| | |
|---|---|
| STATE: | State's Exhibit 24.  Can you read that note? |
| WITNESS: | "Matt, I am so sorry.  I am so tired –" |
| THE COURT: | Blow it up a little bit. |

---

| | |
|---|---|
| STATE: | Your Honor, at this time we're going to play Exhibits 10, 13, and 11, in that order. |

THE COURT: All right. And these are what?

STATE: These are, again, excerpts from interviews that the defendant has given and depositions.

THE COURT: In the civil cases?

STATE: And interviews regarding this case.

(Video began playing)

THE COURT: Hold it a second. Do you-all have any kind of—for the jury's understanding any kind of timeline when this was all done?

STATE: What we did was we took admissible excerpts from a variety of interviews and depositions that the defendant had done, and we put them together in topical areas.

THE COURT: All right. I understand. I'm just trying to give the jury some idea of when this occurred so they can understand the continuity of it.

---

STATE: If you'll move it forward, we can see Monday the 30th, March 30th at 2:06 a.m., Matt calls the Bulls residence. And then go to the 31st. That's Matt's cell phone to the Bulls residence, 20 minutes. Then go to April 3rd.

THE COURT: Wait just a minute. So the jury is not confused, this is not phone calls made to Kari's phone that we talked about earlier.

---

THE COURT: Mr. Henry –

WITNESS: The general –

THE COURT:    Hold on a minute. During our break I had a conversation with one of the camera people –

WITNESS:    Right.

THE COURT:    And he said, "You know what I'd like to know about things is if I turn on the faucet, am I going to get water," you know, not how it got there.

---

THE COURT:    Mr. Henry, can you just tell us if the person – what did – the person that clicked onto this, what did they do? Can you tell us?

WITNESS:    Sure.

THE COURT:    Okay. That's what we're trying to get at.

---

THE COURT:    Mr. Henry, hold it, hold it.

WITNESS:    I'm sorry.

THE COURT:    Did the person who did this buy 50 tablets of Ambien?

WITNESS:    Correct.

---

STATE:    Then March 31st, if you'll just – they can look at it as it goes by – 3:00 p.m. and 9:00 p.m., Matt's cell to the Bulls residence. Take it to, then, April 6th, Matt's cell to the Bulls residence, two calls. Then Friday, April 17th—7th—pardon me—Matt's cell to the Bulls residence, one minute. Then we go to April 8th, which is the day of Kari's death.

THE COURT:    Wait a minute. Go back. I'm not sure everybody can see that. Okay. All right.

In addition, Baker complains of the following actions by the trial court:

1. The trial court interrupts the State's direct examination to emphasize the "point" the State is "trying to make."

2. The trial court *sua sponte* questioned a witness concerning the physical layout of the former offices used by Baker.

3. The trial court explained to the State that they had not offered some photos into evidence.

4. The trial court intervened suggesting that the State "zoom in" on its evidence being projected onto a screen.

5. In punishment, the trial court interrupted the State's direct examination to "clarify" a time frame of an incident.

No objection was made to any of the trial court's comments. Generally, a timely, specific objection at trial must be made or the right to have the appeals court address the complaint on appeal is waived. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007). It is well established that nearly every right may be waived by a party's failure to timely object during trial. *See Saldano v. State*, 70 S.W.3d 873, 887 (Tex. Crim. App. 2002).

Despite the law's general requirement of a timely trial objection, we note that the Court of Criminal Appeals, in a plurality opinion, previously found that a trial court's comments "which tainted [the defendant's] presumption of innocence . . . were fundamental error of constitutional dimension and required no objection." *Blue v. State*, 41 S.W.3d 129, 132 (Tex. Crim. App. 2000). In *Blue*, the trial court, while apologizing to the venire for a long delay, explained that the delay had been caused by the defendant's

inability to decide whether to accept a plea bargain; and then, the trial court expressed its preference that the defendant enter a guilty plea. *Id*. at 130.

Since deciding *Blue*, the Court of Criminal Appeals has clarified the types of statements that trial courts can make without violating *Blue*. *See Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001). In *Jasper*, the Court recognized that several types of comments do not rise to the level of fundamental error unless the comments bear upon the presumption of innocence or vitiate the impartiality of the jury. *Id*. Examples of such comments include those made to correct a misstatement or misrepresentation of previously admitted testimony, to maintain control and expedite the trial, or to clear up a point of confusion, as well as comments revealing irritation at counsel. *Id*. We find that each of the trial court's comments fit within these categories as set forth in *Jasper*, and therefore, do not rise to the level of fundamental error. As such, an objection was necessary in order to preserve error. Because there was no objection, Baker's complaint was not preserved. We overrule issue four.

*Conclusion*

Having overruled Baker's issues in this appeal, we affirm the judgment of the trial court.

TOM GRAY
Chief Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed June 8, 2011
Do not publish
[CRPM]